ment in a particular section of the municipality—would make it the arbiter as to what might or ought to be done for the improvement or benefit of any particular locality. Notwithstanding the learned counsel for the appellant argues with great earnestness the proposition that by the proposed action of the relator the rights of his client are being seriously impaired and that the provisions of the Constitution in that regard are being violated, we think there is absolutely nothing new or novel in the proposition, but that by an unbroken line of decisions extending over a period of nearly a century it has been held that under just such circumstances a corporation authorized to occupy a street or a municipality may be compelled to change its grade and location and the manner of its use, if necessary to meet the new conditions and requirements of the locality.

We think the order appealed from is right, and that it should be affirmed, with costs.

Order affirmed, with costs. All concur.

---

(111 App. Div. 909)

## In re BAILEY.

(Supreme Court, Appellate Division, Fourth Department. January 10, 1906.)

1. WITNESSES—RIGHT TO CONTRADICT ONE'S OWN WITNESS.

    Though a party may not impeach his own witness, he is not precluded from contradicting the witness by other witnesses.

    [Ed. Note.—For cases in point, see vol. 50, Cent. Dig. Witnesses, §§ 1268–1270.]

2. EVIDENCE—CREDIBILITY OF WITNESSES.

    Where the only person who could directly dispute the testimony of a witness is dead, close scrutiny should be given to it, and the question of improbability should be taken into consideration in determining its credibility.

3. GIFTS—CAUSA MORTIS—EVIDENCE—SUFFICIENCY.

    Evidence on the issue whether a decedent made a gift causa mortis examined, and *held*, that the testimony of a witness testifying to facts showing a gift was not sufficiently reliable to justify the finding that decedent made a gift.

4. SAME—DEGREE OF PROOF.

    A donee under a gift causa mortis must furnish clear and convincing proof of the gift, and where, on the whole case, the matter is left in doubt, the claim of the donee fails.

    [Ed. Note.—For cases in point, see vol. 24, Cent. Dig. Gifts, §§ 152, 154, 155.]

Appeal from Surrogate's Court, Orleans County.

In the matter of the final settlement of the accounts of Sarah M. Bailey, as administratrix of the estate of Octavia R. Warner, deceased. From a judgment in favor of James G. Warner and others, seeking to surcharge the accounts, the administratrix appeals. Affirmed.

The opinion of Surrogate Simonds is as follows:

Octavia Warner died in the town of Shelby, April 2, 1902, leaving her surviving James G. Warner of Shelby, a brother; Francis E. Warner, a brother living in the West; Antoinette Howland, a sister living in Alabama, Genesee county; a sister, Mrs. Parker, who subsequently died, leaving two sons who are contestants herein; William Warner, a brother also residing in the West;

and infant children of George S. Warner, a brother; besides Sarah M. Bailey, her sister. Letters of administration were issued to Sarah M. Bailey December 12, 1902, and on April 3, 1903, an inventory was filed by the administratrix, showing an estate consisting mainly of wearing apparel of the value of $34.15, and this sum is accounted for in this settlement proceeding. The contestants seek to surcharge the accounts of the administratrix to the extent of three notes, which were owned by Octavia Warner in her lifetime, one for $1,600, made by George A. Newell, and two others by a Mr. and Mrs. Boots, for $150—and about $92 in money. It appears that the cause of death of the decedent was pneumonia, and that she was dangerously ill with it for several days before her death, and that at the time of her death she was 75 years of age; that for the last five years of her life she had been living with her brother, James G. Warner, on a farm in the town of Shelby, and that his family consisted of himself and his 12-year old son; that for several years previous to her going to live at the home of her brother she had lived in the family of George A. Newell at Medina, N. Y., where she had accumulated some money, for which Mr. Newell had given her a note for $1,600. She had also acquired the Boots notes and some money, and it is these notes and the money which contestants ask should be brought in and accounted for by the administratrix as part of her estate. Octavia Warner was taken ill on Thursday, and on the following day Sarah M. Bailey, her sister, went to the home of James G. Warner to care for her. She died on the Wednesday following. It was claimed by the administratrix that on the 'Monday preceding the death of Octavia Warner a gift of the notes and money was made by the decedent to her.

The contestants to prove the existence of the property called for a witness, Nellie M. Bailey, a daughter of the alleged donee, who also testified to a transaction and a conversation between Octavia Warner and Sarah M. Bailey, the purport of which would be to establish a gift of these notes and the money by Octavia Warner to Sarah M. Bailey, and made in apprehension of death. Considerable latitude was granted the contestants in the examination of this witness, as it was stated to the court by them that she was an adverse witness. The witness undertook several different times to accurately relate what did occur on this occasion of the alleged gift of this property, and in response to requests of counsel of both sides she was permitted to repeat what was said and done on that occasion five or six different times. There was some variation of the words claimed to have been used by the decedent on this occasion in each recurring repetition of the alleged transaction, the substance of which is detailed by the witness finally in these words: "She says, 'Sarah, my pocketbook is in my room between the trunk and the wall, did up in a cloth, will you fetch it to me.' Mother left the room, came back, auntie raised up in bed, mother handed her the pocketbook, she took it, opened it, raised up a roll of bills and a paper, and says: 'My money and notes are in here. I want you to give me a good, decent burial, pay my funeral expenses and doctor bill, get me a good, decent gravestone, and the rest I want you to have and keep it. Keep it where no one else will get it. And then she gave some little details about her burial clothes." The counsel for contestants asked witness how many times she had repeated what Octavia said to her mother before she came on the witness stand, and her answer was, "I do not remember." But she afterwards testified that she had tried to repeat it over so that she would be able to tell it on the witness stand. She also said that she would swear that she had repeated the words just as near as she could remember them. Later in this trial witness testified to going to see George Newell two or three times with her mother, to see if there was a will which had been left by Octavia in his possession, and that she and her mother hunted to see if they could find a will; and when interrogated by counsel as to how long after the death of Octavia it was that she and her mother went to see George Newell, she testified that she could not remember, and, although interrogated regarding it very closely by the counsel, she exhibited a remarkable frailty of memory. The witness also stated that the next day after the alleged transaction of the gift, being the day before Octavia's death, she and her mother opened the pocketbook, counted the money, and read over the notes.

It appears that the family relation existing between the decedent and her brothers and sisters was friendly and cordial, and that there had never been

any trouble between them; that on this Monday, the occasion of this alleged gift, James G. Warner and his son were about the house, presumably in the kitchen; that a day or two before the death of decedent a letter was written to the sister Antoinette, informing her of Octavia's illness, but which did not reach her until after the death of Octavia. The next day after the death of Octavia this sister went to the home of James G. Warner, and there had a talk with Sarah M. Bailey about decedent's property, which witness details, when asked to relate as near as possible what was said by Mrs. Bailey to her on that occasion concerning this matter, as follows: "She said that Octavia handed her her pocketbook just before she died, and I asked her what was in the pocketbook. She says: 'I do not know. I felt so bad I have never opened it.'" The Sunday following the witness relates that she asked Sarah if she cared if she saw what was in her (Octavia's) purse; and Sarah said she had sent it home by her husband, and "I says: 'If Octavia made a will, it will have to go the way she wills it. If not, it will have to be divided.' She says: 'I will go to see George Newell, to see if there is a will.' She asked me if Octavia had ever talked her business over with me, and I said, 'No,' and then I asked her if she had with her, and she said she never mentioned her business to her." Subsequently, and on the 7th day of April following this conversation, a letter was written by Florence Bailey, another daughter of the alleged donee, and addressed to the sister Antoinette. This letter was dictated by Sarah M. Bailey, and in it she said: "Sister Nett: Have been to see George Newell today. Thought if Tay had left a will he would be the most apt to know it. He said there is no will that he knows of. Her purse contained a note against him for $1,600, and notes to the amount of $150, given by Mr. and Mrs. Boots, and $92.10 in money. Yours in haste, Sarah." It appears that "Tay" was a sort of a nickname for Octavia. It further appears that not until several days after the death of Octavia, and not until considerable search and investigation had been made to discover if a will had been left by this decedent, was there any claim made on the part of the alleged donee, or by Nellie M. Bailey, to any of the other next of kin of decedent, as to anything concerning the transaction of the gift alleged to have been made on the Monday preceding the death of Octavia.

While fragmentary evidence has been given on the trial of the case, affording to a certain extent side lights on the situation, yet the foregoing facts are in substance all that appears on the trial; and it is claimed by the contestants that the status of the matter is such that the administratrix should be required to bring this property into this court as a part of the estate, and have it distributed according to law. The administratrix, on the other hand, contends that the testimony of Nellie M. Bailey establishes a good gift causa mortis, and that she as the donee of Octavia Warner is the absolute owner of those notes and the money, and that they are no part of the estate of Octavia Warner, deceased. If it be true, and be accepted as a fact, that the transaction between Octavia Warner and Sarah M. Bailey occurred as detailed by Nellie M. Bailey, the daughter of the alleged donee, then those notes and the money are the property of Sarah M. Bailey and are no part of the estate of Octavia Warner, deceased. The alleged donee contends that the testimony of Nellie M. Bailey is uncontradicted and uncontradictable, and that, inasmuch as the contestants call her as a witness, they vouch for her credibility and are bound by her testimony. There is little doubt as to the rule of law that a party calling a witness may not impeach or assail him; that he vouches for his credibility. Pollock v. Pollock, 71 N. Y. 137; Hankinson v. Vantine, 152 N. Y. 20–27, 46 N. E. 292; Fall Brook Coal Co. v. Hewson, 158 N. Y. 152, 52 N. E. 1905, 43 L. R. A. 676, 70 Am. St. Rep. 466. But the party calling a witness is not precluded from proving facts and circumstances that dispute his witness and show that he was mistaken. Fordham v. Smith, 46 N. Y. 684; Hankinson v. Vantine, 152 N. Y. 27, 46 N. E. 292. And this right of a party to contradict his own witness, by calling other witnesses to prove a fact material to the issue to be otherwise than as sworn to by him, exists even when the necessary effect is to impeach him. Becker v. Koch, 104 N. Y. 403, 10 N. E. 701, 58 Am. Rep. 515. And it is the right of the court to take into consideration all the facts and circumstances in the case, to pass upon the credibility of the witness, to believe a portion of the testimony, or to dis-

believe it, just as in its judgment, intelligently and honestly exercised, it might determine; but I do not wish by this to be understood as saying that, when there are no facts or circumstances that in any wise contradict the testimony of such a witness, a court may entirely disregard his testimony, but, when the only person who could directly dispute it is dead, close scrutiny should be given to it, and the question of improbability should be taken into consideration. Hughes v. Davenport (Sup.) 37 N. Y. Supp. 243.

Is the testimony of Nellie M. Bailey uncontradicted, and is it uncontradictable? When Sarah M. Bailey, the alleged donee, in conversation with Mrs. Howland the next day after the death of Octavia, said that Octavia handed her her pocketbook just before she died, but that she did not know what was in it, that she felt so bad that she had never opened it, and on the Sunday following she said that Octavia had never mentioned her business to her, and when in that conversation she in effect assented to the declaration of Mrs. Howland that "if Octavia made a will, it [meaning her property] will have to go the way she wills it; if not, it will have to be divided"—and Mrs. Bailey replied, "I will go to see George Newell, and see if there is a will," and then she and the daughter Nellie both began a search for a will, and after they had been to see George Newell to learn if he knew of the existence of a will made by Octavia, she caused that letter to be written by her daughter to Mrs. Howland, and made no claim of gift or of ownership to this property, leads to a suspicion, at least, that the transaction as detailed by Nellie M. Bailey could not have occurred. Mrs. Bailey was present in court and heard Mrs. Howland testify, and she does not go upon the witness stand to deny that the conversation between her and Mrs. Howland took place as Mrs. Howland testifies. With this proof of the declarations, admissions, and actions of Sarah M. Bailey immediately following the death of Octavia Warner, and before any claim of ownership was made to this property, it is substantially a contradiction of the testimony of Nellie M. Bailey, and the evidence of a gift causa mortis in this case is not so clear, so strong, and so convincing as the law contemplates and requires in sustaining an alleged gift made in apprehension of death, as claimed in this matter.

We may well inquire into the probabilities or likelihood of Octavia making a gift of substantially her entire estate to one sister, when she for more than five years had lived in the home of her brother, James G. Warner, and when the relations between them and between decedent and the others of her brothers and sisters were friendly and cordial. The testimony of Nellie M. Bailey, upon which alone the alleged donee undertakes to establish a valid gift causa mortis, if not contradicted by the declarations and the actions of the alleged donee herself, might be sufficient to sustain such a gift; but, with this testimony of the declarations and admissions of the alleged donee in the case undisputed and entitled to be taken as true, I cannot help being impressed with the belief that Nellie M. Bailey is mistaken in many of the details of her testimony. This may be accounted for to some extent from the fact that she appeared to be of highly nervous temperament, her recollection of recent occurrences not clear and strong, she had repeated over the story that she told upon the witness stand many times before, and possibly, under the strain of attempting to remember what did occur and in repeating it over as she testified she had done, it may have caused her mind to be impressed with the belief of the story as she told it, when the facts of the occurrence of the transmission of the pocketbook from Octavia Warner to Sarah M. Bailey, from the admissions and declarations of Sarah M. Bailey and the surrounding circumstances, must have been different.

I have viewed the testimony in this matter from all standpoints. I have taken into consideration that Nellie M. Bailey and Sarah M. Bailey, mother and daughter, were in that room with Octavia; that Octavia did in fact hand Mrs. Bailey that pocketbook in which were those notes and the money, substantially all her property; and it was possible that Octavia spoke concerning it as Nellie M. Bailey states that she did, which would make a good gift causa mortis. But when I consider the fact that Nellie testified that the pocketbook was handed over two days before Octavia died, that she and her mother counted over the money and read over the notes the day before Octavia died, and then the next day after Octavia's death Mrs. Bailey declares to Mrs.

Howland that Octavia handed her her pocketbook just before she died, and the following Sunday she stated she did not know what was in the pocketbook and that she had sent it home by her husband, and she assented to the proposition of Mrs. Howland that "if Octavia has made a will, the property would have to go as Octavia wills it; if not, then it would have to be divided"—and stated to Mrs. Howland that she would go and see George Newell "to see if there is a will," and that Octavia had never mentioned her business to her, and that she did go with her daughter Nellie to see George Newell to learn if there was a will, and after learning the fact that there was probably no will she wrote to Mrs. Howland the result of her search for a will, and then for the first time stated to her what the pocketbook contained, and made no pretense of ownership of it, all the facts and circumstances, the actions of Mrs. Bailey and her daughter subsequent to Octavia's death, and the improbability that Octavia, who had lived the last five years of her life in her brother's family, made such a gift, and that feeling between them and between the various members of the relationship were cordial and friendly, lead me to be unconvinced that a gift of all this property was in fact made and intended. I understand the rule of law to be that in a case of this character it is the duty of the claimant of the alleged gift to furnish the most clear and convincing proof of it, and that, when upon the whole case the matter is left in doubt, the claim of the alleged donee must fail. Doty v. Willson, 47 N. Y. 580; Matter of Rogers, 10 App. Div. 593–595, 42 N. Y. Supp. 133.

With this view of the facts, and understanding and application of the rules of law, I must conclude that these notes and the money were and are a part of Octavia Warner's estate, and must be brought in and accounted for as such by the administratrix.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and NASH, JJ.

Safford E. North, for appellant.

Filkin & Coe, for respondent.

PER CURIAM. Decree of Surrogate's Court affirmed, with costs, on the opinion of Surrogate Simonds.

---

（112 App. Div. 688)

### ROWE v. WHITE.

(Supreme Court, Appellate Division, Fourth Department. May 2, 1906.)

1. CORPORATIONS—STOCK—DIVIDENDS—SELLER AND BUYER OF STOCK.

Where the owner of corporate stock gave an option agreeing to sell it to defendant or to a corporation he might indicate, and at defendant's request delivered it to a corporation, a dividend declared after the option was given, but before the sale was consummated, belongs to the original owner, and not to defendant, notwithstanding a transfer of the stock by the corporation to defendant by indorsement dated back, at defendant's direction, to a day prior to the declaration of the dividend.

[Ed. Note.—For cases in point, see vol. 12, Cent. Dig. Corporations, § 569.]

2. SAME.

Where the owner of corporate stock gave an option by which he agreed to sell it within six months at defendant's request to defendant or to a corporation he might name, and the defendant made a written request that it be sold to a corporation, but with the understanding that he should not assume any responsibility for the purchase price till certain conditions were complied with, and this request was accompanied by a request for a commission, it was not in pursuance of the option, so as to deprive the seller of his right to a dividend declared in the meantime by relating the sale back to the date of the option.